UNITED STATES of America, Plaintiff–Appellee,

v.

Elton E. BRYAN, a/k/a Butch, Defendant–Appellant.

No. 94–5124.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 9, 1994.

Decided June 27, 1995.

---

**ARGUED:** Jerald Elton Jones, West & Jones, Clarksburg, WV, for appellant. Michael Lee Keller, Asst. U.S. Atty., Charleston, WV, for appellee. **ON BRIEF:** John S. Kaull, West & Jones, Clarksburg, WV, for appellant. Rebecca A. Betts, U.S. Atty., Charleston, WV, for appellee.

Before LUTTIG, Circuit Judge, MICHAEL, United States District Judge for the Western District of Virginia, sitting by designation, and CURRIE, United States District Judge for the District of South Carolina, sitting by designation.

Affirmed in part and reversed in part by published opinion. Judge LUTTIG wrote the opinion, in which Judge MICHAEL and Judge CURRIE joined.

## OPINION

LUTTIG, Circuit Judge:

Appellant, Elton "Butch" Bryan, is a former director of the West Virginia Lottery. In September 1993, a federal jury in Charleston, West Virginia found Bryan guilty of two counts of mail fraud in violation of 18 U.S.C. §§ 1341, 1346, one count of wire fraud in violation of 18 U.S.C. §§ 1343, 1346, and one count of securities fraud in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b–5. These convictions stemmed from Bryan's fraudulent manipulation of two government contracts and from Bryan's use of confidential, nonpublic information in the purchase of securities of companies doing business with the West Virginia Lottery. Bryan was also convicted of perjury in violation of 18 U.S.C. § 1623, for giving false testimony before a grand jury. The district court sentenced Bryan to 51 months in prison.

Bryan challenges each of his convictions on appeal. We affirm both mail fraud convictions, the wire fraud conviction, and the perjury conviction. We reverse Bryan's conviction for securities fraud.

## I.

Bryan became Director of the West Virginia Lottery (the Lottery) in April 1990, when he was appointed by West Virginia Governor Gaston Caperton. As Lottery Director, Bryan was charged with negotiating and securing contracts on behalf of the Lottery. In January 1991, with its existing advertising contract due to expire that summer, the Lottery began the selection process for its award of a $2.8 million advertising contract. Although the Lottery previously had relied on subcontractors to secure the Lottery's advertising services, it was decided in 1991 that the Lottery would contract with the new advertising agency directly and that the forthcoming contract would be awarded through an open bidding process.

Bryan assigned responsibility for the selection process to Tamara Gunnoe, the Lottery's Deputy Director of Marketing. Gunnoe in turn formed a seven-member evaluation committee, which included five Lottery employees and two advertising consultants, to review presentations made by agencies bidding on the contract. In early April 1991, six agencies made presentations before the evaluation committee in formal one-hour sessions. The committee members scored each presentation on a numerical evaluation sheet designed to rate the merits of the presentations. Among the companies bidding for the $2.8 million contract was the Fahlgren Martin Agency, the agency that had provided the Lottery's advertising services under the expiring contract. Tabulation of the scoresheets, however, revealed that the Arnold Agency had received the committee's highest rating.

After completing the evaluation process, Gunnoe met with Bryan to brief him on the results. She informed Bryan that the Arnold Agency had received the committee's highest rating and that the committee had decided to recommend that the Arnold Agency be awarded the contract. Gunnoe also presented Bryan with a sheet summarizing the results the committee had reached. Bryan advised Ms. Gunnoe that he would have to give the matter further consideration before making any decisions.

After meeting with Gunnoe, Bryan discussed the matter of the advertising contract with Governor Caperton. Caperton and Bryan decided to award the contract to the Fahlgren Martin Agency, notwithstanding the committee's recommendation of the Arnold Agency. Bryan informed Gunnoe of this decision and directed her to surrender to Edward ReBrook, legal counsel for the Lottery, all of the evaluation committee's forms documenting that the Arnold Agency had received the committee's highest evaluation.

Neither Bryan nor the Governor, however, had unilateral power to award the advertising contract. Rather, the seven-member West Virginia Lottery Commission (the Commission) had to approve the contract before it could officially be awarded. Hearings before the Commission to consider the contract had already been scheduled for April 24, 1991.

Fully aware of the Commission's authority and fully aware that hearings had already been scheduled, Bryan, without the Commission's knowledge or approval, sent letters on April 16 notifying those agencies bidding for the contract that Fahlgren Martin had been awarded the advertising contract. Although he had already notified the interested parties that Fahlgren Martin had been selected, Bryan nonetheless decided to seek the approval of the Commission at the April 24 hearing and to represent to the Commission at the hearing that the selection process was still open.

Deputy Director Gunnoe appeared before the formal session of the Commission on April 24 to testify about the evaluation committee's findings and recommendations. At Bryan's direction, Gunnoe falsely testified to the Commission that the evaluation committee had decided to recommend the Fahlgren Martin Agency for the contract, that the committee had not used a numerical scoring procedure in evaluating the bid proposals, and that there existed no numerical scoresheets reflecting the committee's evaluations. To support her falsified testimony, Gunnoe presented to the Commission altered versions of her notes of the evaluation committee's meetings and characterized those notes as reflective of the committee's deliberations. The Commission voted to adopt the evalua-

tion committee's "recommendation" of Fahlgren Martin on May 29, 1991.

Bryan's scheme to have Fahlgren Martin awarded the contract hit a snag in June 1991, when Harold Curtiss of the Department of Administration's Purchasing Division found Bryan's contract proposal recommending Fahlgren Martin to be deficient. In particular, Curtiss questioned the absence of any quantitative data to support the Commission's recommendation. When Curtiss inquired of the Lottery whether a quantitative analysis had been used in the evaluation process, he was falsely advised that the committee had not used a quantitative analysis. Fearing that Curtiss might persist in challenging the Lottery's contract proposal, Bryan instructed Gunnoe to have some of the evaluation committee's members prepare memoranda falsely evidencing their support for Fahlgren Martin. Bryan and Gunnoe later met with Curtiss and his supervisor and continued in their misrepresentation that the only quantitative data to support the recommendation were Gunnoe's altered notes, which had earlier been provided to the Commission.

As a result of Bryan's and Gunnoe's misrepresentations, the Purchasing Division ultimately approved the proposed $2.8 million advertising contract, which was signed by the Lottery and Fahlgren Martin on August 6, 1991. The Lottery immediately thereafter began sending checks through the mail pursuant to the terms of the contract. The mailing of these checks, in conjunction with Bryan's conduct in manipulating the award of the advertising contract, served as the basis for Bryan's first mail fraud conviction.

At about the time Bryan was completing the advertising contract, he began to investigate the possible expansion of video lottery gaming throughout West Virginia. "Video lottery" is the gaming trade name for those lottery games played by individuals on interactive electronic terminals. The state-run video lottery industry in West Virginia was in its infancy in the summer of 1991, with the only authorized video lottery machines located at Mountaineer Park, a horse-racing track in Chester, West Virginia.

In July 1991, high-level members of Governor Caperton's administration, including Bryan, decided to launch a statewide expansion of video lottery gaming. The plan called for the installment of approximately 5,000 machines in race tracks, bars, restaurants, and other locations throughout the state. Due to the perceived political unpopularity of expanding video lottery, however, it was decided in the summer of 1991 that the implementation of a statewide video lottery system would not take place until after Governor Caperton's anticipated re-election in November 1992.

Several video lottery manufacturing companies began lobbying for a piece of the anticipated video gaming business in July 1991, after they became aware of the proposed expansion of video lottery in West Virginia. One company in particular, Video Lottery Consultants (VLC) of Bozeman, Montana, aggressively sought to maximize its share of the potential West Virginia video lottery market. VLC ultimately gained favor with Governor Caperton in the summer of 1992, when it promised to locate a manufacturing plant in West Virginia in exchange for a statewide monopoly on the sale of video lottery machines. Governor Caperton developed a strong interest in the proposal and ultimately decided that VLC would be granted a "single source" contract, under which VLC would be the exclusive supplier of video lottery gaming terminals in West Virginia.

After Governor Caperton decided upon VLC, Bryan sought to ensure that VLC would receive a single source contract and that West Virginia would receive a manufacturing facility, as per the agreement. In much the same way he rigged the award of the $2.8 million advertising contract, Bryan undertook to ensure that the Lottery Commission would award a single source video lottery contract to VLC. From August 1992 through November 1992, Bryan and William Woodford, the Deputy Director of the Lottery, held a series of meetings with VLC officials to finalize the agreement reached by Governor Caperton and VLC executives earlier that summer.

In August, Bryan and Woodford flew to VLC's headquarters in Bozeman to hammer

out details with VLC executives. After returning from Bozeman, Bryan directed Woodford to draft a Request for Proposals (RFP) calling for a single source provider of video lottery technology. At the same time, administration officials assured VLC executives that the RFP would also specifically call for a type of electronic network that only VLC could supply.

Later that same month, a VLC agent flew to West Virginia to inspect several locations in Barbour County, West Virginia, that Bryan had suggested as possible sites for VLC's proposed manufacturing facility. Bryan and Woodford met with VLC representatives again in September, this time in Charleston, West Virginia. Woodford's notes from this meeting were used to draft the RFP for a single source contract that would be submitted to the Lottery Commission. In October 1992, Woodford supplied VLC representatives with an advanced copy of the unpublished RFP.

Governor Caperton was re-elected in the general election of November 1992, at which time the Caperton administration immediately began to implement the previously undisclosed plan to expand video lottery. The Lottery Commission voted in favor of the expansion on November 30, 1992, and ordered the formation of a subcommittee to investigate the best way to proceed with the expansion. Despite the Commission's decision to form an investigatory subcommittee, Bryan directed Woodford, without the Commission's knowledge or approval, to proceed with the issuance of the RFP that had already been drafted prior to the Commission's vote of approval for the expansion plan. Two bid packages were submitted in response to the RFP: one by VLC and one by International Game Technology (IGT), a rival of VLC. Although Woodford formed a committee to evaluate these bid packages, Bryan had specifically informed Woodford that he wanted VLC to be awarded the contract. Shortly thereafter, Woodford submitted the committee's report, with VLC's bid receiving the highest evaluation.

Bryan scheduled a meeting for January 20, 1993, to announce that VLC had been awarded the video lottery contract. Bryan cancelled that meeting, however, after he received a federal grand jury subpoena on January 19, 1993, calling for records pertaining to video lottery. The video lottery contract was never awarded. Bryan's handling of the video lottery contract gave rise to his second conviction for mail fraud.

Bryan's convictions for wire and securities fraud were based upon his trading in the shares of companies doing business with the West Virginia Lottery. In 1991 and 1992, Bryan purchased shares of IGT and GTech, both of which were bidding for valuable contracts before the Lottery, and in September 1992, soon after the decision had been made to select VLC as the exclusive supplier of terminals in the statewide expansion of video lottery, Bryan purchased 300 shares of VLC stock. Bryan made all of these trades on the basis of nonpublic, confidential information entrusted to him in his capacity as Lottery Director.

Bryan appeals all four of his fraud convictions, as well as his conviction for providing false testimony before a grand jury in connection with this case.

## II.

We first address Bryan's challenges to his two mail fraud convictions. *See* 18 U.S.C. §§ 1341, 1346. The first count relates to Bryan's role in orchestrating a scheme of deception against the West Virginia Lottery Commission to ensure that the Commission would award the state's $2.8 million advertising contract to Fahlgren Martin. The second count relates to Bryan's role in rigging the bid process for the state's video lottery contract to ensure that VLC would prevail. The government secured these convictions on the theory that Bryan defrauded the people of the State of West Virginia by depriving them of the right to the "honest services" of their government officials.

■ The federal mail fraud statute prohibits the use of the mails for the purpose of executing "any scheme or artifice to defraud." 18 U.S.C. § 1341. In 1988, Congress enacted 18 U.S.C. § 1346, which provides that for the purposes of the mail and wire fraud statutes, "the term 'scheme or

artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."

Bryan argues that the evidence was insufficient to support his convictions under these provisions because "there was no evidence that [he] violated any law, statute or binding regulation in his conduct with respect to the Fahlgren–Martin contract or the video lottery contract." Appellant's Br. at 11–12. Relatedly, he claims that "there was no standard by which [he] could be expected to know whether his conduct would deprive the citizens of West Virginia of fair and honest governmental services." *Id.* at 12.

As to Bryan's claim that a conviction under section 1346 requires proof that the defendant violated some law or regulation other than the mail fraud statute itself, we considered, and rejected, an essentially identical argument in *United States v. Mandel,* 591 F.2d 1347 (4th Cir.1979) (*Mandel I*), *aff'd. in relevant part,* 602 F.2d 653 (*en banc*), *cert. denied,* 445 U.S. 961, 100 S.Ct. 1647, 64 L.Ed.2d 236 (1980), and we reject it again here. In *Mandel I,* the Governor of Maryland and several associates were convicted of mail fraud and racketeering charges resulting from a scheme involving the manipulation of the Maryland horse racing industry. The appellants argued, *inter alia,* that their convictions were "based on an unwarranted overextension of the mail fraud statute ... since the government's theory of the case did not depend upon the violation of any state or federal law, including the common law in the execution of the alleged scheme to defraud." *Id.* at 1359. We rejected this argument, noting that "the several courts that have been called on to decide the question are uniformly of opinion that the fact that a scheme to defraud may or may not violate

state law does not determine whether the scheme is within the proscription of the mail fraud statute." *Id.* at 1361 (citing *United States v. McNeive,* 536 F.2d 1245, 1247 n. 2 (8th Cir.1976); *United States v. Keane,* 522 F.2d 534, 544 (7th Cir.1975), *cert. denied,* 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976); *United States v. States,* 488 F.2d 761, 767 (8th Cir.1973), *cert. denied,* 417 U.S. 909, 94 S.Ct. 2605, 41 L.Ed.2d 212 (1974); *United States v. Edwards,* 458 F.2d 875, 880 (5th Cir.), *cert. denied,* 409 U.S. 891, 93 S.Ct. 118, 34 L.Ed.2d 148 (1972)); *see also United States v. Shamy,* 656 F.2d 951, 957 (4th Cir.1981), *cert. denied,* 455 U.S. 939, 102 S.Ct. 1429, 71 L.Ed.2d 649 (1982).

The convictions in *Mandel I* were vacated following the Supreme Court's opinion in *McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). *See United States v. Mandel,* 862 F.2d 1067 (4th Cir.1988) (*Mandel II*) (affirming *United States v. Mandel,* 672 F.Supp. 864 (D. Md.1987)), *cert. denied* 491 U.S. 906, 109 S.Ct. 3190, 105 L.Ed.2d 699 (1989). However, they were vacated not because the government had failed to demonstrate a violation of some state law or regulation, but rather because the defendants' "scheme or artifice to defraud" deprived the citizens of Maryland only of "the intangible right to good government," and not of property. The Court in *McNally* had rejected the "intangible rights" theory of mail fraud, and it was for this reason that we affirmed the vacatur of the *Mandel* defendants' convictions. *See id.* at 1072–73. Thus, although the convictions in *Mandel I* did not survive *McNally,* the holding of *McNally* did not affect our ruling in *Mandel I* that the mail fraud statute contains no predicate violation requirement.[1]

1. Although the *McNally* holding did not do so, *dicta* in *McNally* suggested that, were the Court faced with the question, it might not uphold the widely-accepted rule that a mail fraud conviction is not dependent on a violation of state law. *See McNally,* 483 U.S. at 361 n. 9, 107 S.Ct. at 2882 n. 9 ("It may well be that Congress could criminalize using the mails to further a state officer's efforts to profit from governmental decisions he is empowered to make or over which he has some supervisory authority. But if state law expressly permitted or did not forbid a state officer ... to have an ownership interest in an

insurance agency handling the State's insurance, it would take a much clearer indication than the mail fraud statute evidences to convince us that having and concealing such an interest defrauds the State and is forbidden under federal law."). Although we consider the Court's statement significant, it ultimately does not alter our conclusion that a predicate violation is not required to establish a violation of section 1341. Not only was this statement *dicta* to begin with, but it appears that *McNally* "has since been nullified by statute," through Congress' enactment of 18 U.S.C. § 1346. *United States v. Dischner,* 974

That the mail fraud statute contains no predicate violation requirement is seemingly confirmed by *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), decided by the Supreme Court in the Term following *McNally*. Had *McNally* interpreted the mail fraud statute so as to require a predicate violation, the mail fraud convictions in *Carpenter* would surely have been overturned, because the government had not alleged the violation of any law or regulation aside from the mail fraud statute itself. The fraud prosecutions in *Carpenter* were based on the theory that the petitioner, a reporter for the *Wall Street Journal*, had violated the *Journal*'s "official policy and practice," *id.* at 23, 108 S.Ct. at 319, when he traded securities on the basis of information gathered for a newspaper column. The petitioner thus had breached only his "fiduciary obligation to protect confidential information obtained during the course of his employment." *Id.* at 27, 108 S.Ct. at 321 (citation omitted).[2]

■ The Court in *Carpenter* was only interpreting 18 U.S.C. §§ 1341 and 1343, Congress not having enacted 18 U.S.C. § 1346 until after *Carpenter* was decided. We see no reason, however, to read into the mail fraud statute an independent criminal violation requirement when the fraud conviction is based on the deprivation of the right to intangible services as opposed to the deprivation of property or money, as in *Carpenter*. We therefore reject Bryan's contention that the government was required to prove that

he violated a criminal statute independent of the mail fraud statute in order to establish a violation of 18 U.S.C. §§ 1341, 1346.

In what we take to be an alternative argument, Bryan argues that if section 1346 does not define a "deprivation of the right to honest services" by reference to a statute or regulation, then he "had no reasonable way to know, at the time of his actions, that his conduct in dealing with his staff, the Lottery Commission, and the Purchasing Department would be deemed by the government to be unlawful." Appellant's Reply Br. at 9. To the extent that this amounts to an argument that section 1346 should be declared void for vagueness, we are unpersuaded.[3]

It is axiomatic that "[d]ue process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal, for 'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" *Buckley v. Valeo*, 424 U.S. 1, 77, 96 S.Ct. 612, 662, 46 L.Ed.2d 659 (1976) (quoting *United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954)); *see also Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983) ("[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary

---

F.2d 1502, 1518 n. 16 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1290, 122 L.Ed.2d 682 (1993); *see also United States v. DeFries,* 43 F.3d 707, 709 n. 1 (D.C.Cir.1995) (18 U.S.C. § 1346 "overturned *McNally* "); *United States v. Thomas,* 32 F.3d 418, 419 (9th Cir.1994) (same); *United States v. Holley,* 23 F.3d 902, 910 (5th Cir.) (same), *cert. denied,* —— U.S. ——, 115 S.Ct. 635, 130 L.Ed.2d 542 (1994); *see also West Virginia Univ. Hosps., Inc. v. Casey,* 499 U.S. 83, 114, 111 S.Ct. 1138, 1155, 113 L.Ed.2d 68 (1991) (Stevens, J., dissenting) ("[The Court's] refusal to accept the widely held view of lower courts about the scope of fraud, see *McNally* ..., was quickly corrected by the 100th Congress" through enactment of 18 U.S.C. § 1346). That Congress enacted section 1346 so soon after *McNally* strongly suggests that section 1346 was intended as precisely the sort of "clear indication" that Congress was content with the pre*McNally* interpretations of the mail fraud statute such as that evidenced in *Mandel I*.

2. Bryan, similarly, violated the oath he signed upon assuming office, in which he pledged to administer the West Virginia lottery in an honest, legal, and efficient manner, and agreed to conduct his personal affairs and those of the Lottery in such a manner that the two interests would not conflict or appear to conflict. J.A. at 81.

3. Again, this is consistent with pre-*McNally* practice, in which vagueness challenges to prosecutions under the mail fraud statute were generally rejected. *See, e.g., United States v. Margiotta,* 688 F.2d 108 (2d Cir.1982), *cert. denied,* 461 U.S. 913, 103 S.Ct. 1891, 77 L.Ed.2d 282 (1983); *United States v. Bohonus,* 628 F.2d 1167, 1173–75 (9th Cir.), *cert. denied,* 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980); *United States v. Louderman,* 576 F.2d 1383, 1388 (9th Cir.), *cert. denied,* 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978).

and discriminatory enforcement."); *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972). The Supreme Court has repeatedly held, however, that "vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand." *United States v. Mazurie*, 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975); *see also Chapman v. United States*, 500 U.S. 453, 467, 111 S.Ct. 1919, 1928–29, 114 L.Ed.2d 524 (1991). Bryan's is not a challenge implicating First Amendment concerns, *compare Buckley*, 424 U.S. at 76–82, 96 S.Ct. at 662–65 (vagueness challenge to Federal Election Campaign Act), and he therefore must contend with the general rule that "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness," *Parker v. Levy*, 417 U.S. 733, 756, 94 S.Ct. 2547, 2562, 41 L.Ed.2d 439 (1974).

■ The mail fraud statute's honest services provision clearly applies to Bryan's conduct. The legal meaning of "a deprivation of the intangible right to honest services" has been extensively developed by the courts, and indisputably includes conduct such as Bryan's. In *United States v. Barber*, 668 F.2d 778, 784 n. 4 (4th Cir.), *cert. denied*, 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982), for example, we held that state officials owe a "fiduciary duty ... to the state and its citizens," and that one who schemes to deprive citizens of "the honest and faithful performance of an official's duties" violates section 1341. Accordingly, we affirmed the mail fraud conviction of the Commissioner of the West Virginia Beverage Control Commission, who had manipulated warehouse records and otherwise abused his position in order to obtain free liquor for himself and other officials. *Id.* at 781. Similarly, in *Mandel I*, we found the mail fraud statute violated by the Governor of Maryland and several of his associates, who had manipulated the state's horse racing industry. The Governor's associates were guilty of failing to disclose their ownership of various racetracks during their dealings with the Maryland Racing Commission; the Governor, meanwhile, had failed to disclose his involvement with the race track owners to state legislators who were consid-

ering a bill benefitting the track owners. *Mandel I*, 591 F.2d at 1355.

Other circuits likewise have held that schemes involving various types of dishonesty by public officials come within the ambit of the mail fraud statute because such schemes defraud citizens of their intangible rights to honest and impartial government. *See, e.g., United States v. Silvano*, 812 F.2d 754, 755–57 (1st Cir.1987) (affirming mail fraud conviction of city budget director who schemed to have city insurance contract awarded to company in which friend held significant interest); *United States v. Brown*, 540 F.2d 364, 368–70 (8th Cir.1976) (affirming mail fraud convictions of city building commissioner who, in exchange for rent payments, manipulated bid process for demolition projects to benefit associate); *United States v. Bush*, 522 F.2d 641, 643–46 (7th Cir.1975) (affirming mail fraud conviction of city Director of Public Relations, based on his failure to disclose to other city officials his ownership of a company bidding for city projects and on his subsequent concealment efforts), *cert. denied*, 424 U.S. 977, 96 S.Ct. 1484, 47 L.Ed.2d 748 (1976).

Under these authorities, there can be little doubt that Bryan's use of the mails in the course of rigging the bids relating to the West Virginia Lottery is a species of mail fraud. While these authorities predate *McNally*'s invalidation of the "honest services" theory, we do not question their general applicability, now that the "honest services" proscription has been codified in 18 U.S.C. § 1346. *See United States v. D'Alessio*, 822 F.Supp. 1134, 1148 (D.N.J.1993) ("In the wake of section 1346, the pre-*McNally* caselaw relied on by the Government still has persuasive effect."). Nor, given the likelihood that these authorities would be applicable under the new statute, do we believe that Bryan should be heard to complain that he lacked adequate notice that the conduct upheld as fraudulent in these cases might be considered fraudulent under the newly-enacted statute.

In short, Bryan should have known that his conduct might be unlawful, and it appears from the extensive measures he undertook to

disguise his behind-the-scenes scheming that he in fact did believe in the illegality of that conduct.

## III.

■ Bryan also challenges his conviction for violating the federal wire fraud statute, 18 U.S.C. §§ 1343, 1346, which was based upon his trading in the stock of companies that stood to gain from the decisions of the West Virginia Lottery Commission. Bryan contends that the government's case against him was flawed because it included no evidence of benefit or gain accruing to him, and "no proof of actual or constructive fraud." Appellant's Br. at 27. Once again, Bryan's sufficiency challenge reflects a misunderstanding of the elements of the crime charged. The gravamen of the offense of wire fraud is simply the execution of a " 'scheme to defraud,' " *Barber*, 668 F.2d at 784 (quoting *United States v. George*, 477 F.2d 508, 512 (7th Cir.), *cert. denied*, 414 U.S. 827, 94 S.Ct. 155, 158, 38 L.Ed.2d 61 (1973)), and "the fraud need not succeed" for a defendant to be convicted of wire fraud, *Dischner*, 974 F.2d at 1521. Bryan's claim that the jury was presented with insufficient "proof of actual or constructive fraud" likewise fails. The jury was presented with ample evidence that Bryan was engaged in a scheme to defraud the citizens of West Virginia of their right to his honest services, and that he traded on confidential information. *Cf. Car-*

*penter*, 484 U.S. at 26, 108 S.Ct. at 320–21 (confidential information is "property," the deprivation of which can constitute wire fraud).

## IV.

Bryan next challenges his conviction for securities fraud under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78ff, and Rule 10b–5, 17 C.F.R. § 240.10b–5.[4] The government proceeded against Bryan under the so-called "misappropriation theory" of securities fraud liability, a theory that, although novel to this circuit, has been embraced by the Second, Seventh, and Ninth Circuits. *See United States v. Newman*, 664 F.2d 12 (2d Cir.1981), *aff'd after remand*, 722 F.2d 729 (2d Cir.), *cert. denied*, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983); *United States v. Chestman*, 947 F.2d 551 (2d Cir.1991) (*en banc*), *cert. denied*, 503 U.S. 1004, 112 S.Ct. 1759, 118 L.Ed.2d 422 (1992); *SEC v. Cherif*, 933 F.2d 403 (7th Cir.1991), *cert. denied*, 502 U.S. 1071, 112 S.Ct. 966, 117 L.Ed.2d 131 (1992); *SEC v. Clark*, 915 F.2d 439 (9th Cir.1990).[5] The Supreme Court has yet to address whether the misappropriation theory is reconcilable with the language and purposes of section 10(b) and Rule 10b–5, having evenly divided on the validity of a conviction based on this theory in *Carpenter v. United States*, 484 U.S. 19, 24, 108 S.Ct. 316, 319–20, 98 L.Ed.2d 275 (1987).[6] *See also Chiarella v. United*

---

**4.** Section 10(b) provides, in relevant part, that
It shall be unlawful for any person, directly or indirectly ... (b) To use or employ, in connection with the purchase or sale of any security[,] ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
15 U.S.C. § 78j(b). Rule 10b–5, promulgated by the SEC pursuant to section 10(b), provides, in relevant part, that
It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce ...
 (a) [t]o employ any device, scheme, or artifice to defraud, [or] ...
 (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

**5.** As do many of the courts that have addressed the misappropriation theory, the government also identifies the Third Circuit as having adopted the theory, citing *Rothberg v. Rosenbloom*, 771 F.2d 818 (3d Cir.1985), *rev'd after remand*, 808 F.2d 252 (1986), *cert. denied*, 481 U.S. 1017, 107 S.Ct. 1895, 95 L.Ed.2d 501 (1987). The court in *Rothberg*, however, merely adverted to the theory in a single sentence, and even then, not by name. *Id.* at 822.

**6.** Although the Court in *Carpenter* evenly divided over the securities fraud conviction, one cannot help but detect a note of skepticism in the manner in which the Court framed the government's argument in that case:

Although the victim of the fraud, the Journal, was not a buyer or seller of the stocks traded in or otherwise a market participant, the fraud was *nevertheless* considered to be "in connec-

*States,* 445 U.S. 222, 235–36, 100 S.Ct. 1108, 1118–19, 63 L.Ed.2d 348 (1980) (declining to address merit of misappropriation theory because theory not submitted to jury).

■ We conclude that neither the language of section 10(b), Rule 10b–5, the Supreme Court authority interpreting these provisions, nor the purposes of these securities fraud prohibitions, will support convictions resting on the particular theory of misappropriation adopted by our sister circuits. Section 10(b), insofar as concerns us, *see infra* pp. 945–46, prohibits only the use of deception, in the form of material misrepresentations or omissions, to induce action or inaction by purchasers or sellers of securities, or that affects others with a vested interest in a securities transaction. In contravention of this established principle, the misappropriation theory authorizes criminal conviction for simple breaches of fiduciary duty and similar relationships of trust and confidence, whether or not the breaches entail deception within the meaning of section 10(b) and whether or not the parties wronged by the breaches were purchasers or sellers of securities, or otherwise connected with or interested in the purchase or sale of securities. Finding no authority for such an expansion of securities fraud liability—indeed, finding the theory irreconcilable with applicable Supreme Court precedent—we reject application of the theory in this circuit.[7] We hold therefore that the district court plainly erred in instructing the jury that it could convict Bryan of securities fraud on the basis of the misappropriation theory of Rule 10b–5 liability. *See, e.g., United States v. Olano,* 113 S.Ct. 1770, (1993); *United States v. Piccolo,* 835 F.2d 517, 519 (3d Cir.1987) (jury instructions "allowing conviction for conduct outside the proscription of the mail fraud

statute" constitute plain error affecting substantial rights).

### A.

■ Those courts that have adopted the misappropriation theory with which we are concerned in this case have read section 10(b) and Rule 10b–5 to authorize the criminal conviction of a person who

> (1) misappropriates material nonpublic information (2) by breaching a duty arising out of a relationship of trust and confidence and (3) uses that information in a securities transaction, (4) regardless of whether he owed any duties to the shareholders of the traded stock.

*Clark,* 915 F.2d at 443. Under this misappropriation theory, the "fraud" requirement of Rule 10b–5 is deemed to be satisfied when a person "misappropriates material nonpublic information in breach of a fiduciary duty or similar relationship of trust and confidence." *Chestman,* 947 F.2d at 566; *see also Newman,* 664 F.2d at 17 (by stealing information from their employers defendants "defrauded those employers as surely as if they took their money"). The source of the nonpublic information need not be a purchaser or seller of securities, be affiliated with a purchaser or seller, or be in any way connected to or even interested in the purchase or sale of securities. *See Chestman,* 947 F.2d at 567 (referring to misappropriation theory as a "fraud-on-the-source" theory of 10b–5 liability); *see also id.* at 566 ("In contrast to *Chiarella* and *Dirks,* the misappropriation theory does not require that the buyer or seller of securities be defrauded."). Even though the defendant owes no duty of disclosure to the purchaser or seller of the securities, the completed fraud (*i.e.,* the misappropriation) is deemed to be "in connection with the purchase or sale of [a] security," because the misappropriated information is thereafter used in a securities

---

tion with" a purchase or sale of securities within the meaning of the statute and the rule. *Carpenter,* 484 U.S. at 24, 108 S.Ct. at 319 (emphasis added).

7. It is important to emphasize that we are not addressing whether trading on the basis of misappropriated information can ever give rise to criminal liability; in many instances it will, such as where a corporate executive trades in shares

of his own company, without disclosure, on the basis of information entrusted to him solely for corporate purposes. *See Chiarella,* 445 U.S. at 230, 100 S.Ct. at 1115–16. We address only the particular theory of misappropriation described herein, which has been adopted by the other circuits and on which Bryan's conviction was based.

transaction. *See, e.g., SEC v. Materia,* 745 F.2d 197, 202 (2d Cir.1984) ("[W]hether a defendant has breached a duty to a particular plaintiff" is not "germane" in a criminal prosecution under section 10(b)), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985); *Clark,* 915 F.2d at 443.

■ Bryan's conduct clearly constituted criminal activity under this theory of misappropriation. The theory's "fraud" requirement was satisfied when, in breach of his duty of confidentiality and his statutory obligation to refrain from using his position for personal gain, Bryan misappropriated information pertaining to the awarding of the video lottery contract, entrusted to him as the West Virginia Lottery Director. The fraud was "in connection with the purchase or sale of any security," because Bryan subsequently used the misappropriated confidential information in the purchase of shares of VLC. This is so, even though, as the government concedes, Bryan "occupied no relationship of trust and confidence with respect to the companies bidding for video lottery business or to their shareholders," Appellee's Br. at 28 n. 9, and therefore owed no duty of disclosure to the market participants with whom he traded. The question for us, however, is not whether Bryan's conduct violated section 10(b) under this particular misappropriation theory, but rather, whether criminal liability under section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 can be predicated upon such a theory.

■ The language of section 10(b) and Rule 10b–5 sweeps broadly. The statute prohibits the use of "any" manipulative or deceptive device or contrivance "in connection with" the purchase or sale of "any" security. Similarly, Rule 10b–5 prohibits the use of "any" device, scheme, or artifice to defraud and criminalizes "any" act, practice, or course of business that operates as a "fraud or deceit" upon "any" person. Absent guidance from the Supreme Court, the language of the Rule, if not of the statute, could plausibly accommodate the misappropriation theory. *See, e.g., Clark,* 915 F.2d at 448–49 (concluding that "the misappropriation theory fits comfortably" within "the notoriously vague" terms of section 10(b) and Rule 10b–

5); *Cherif,* 933 F.2d at 410 n. 5 ("There is little question that the vague term 'fraud' as used in Section 10(b) and Rule 10b–5 can encompass the misappropriation theory."); *see also Chestman,* 947 F.2d at 564 (referring to the "expansive language" of Rule 10b–5). For at least two decades, however, the Supreme Court has repeatedly warned against expanding the concept of fraud in the securities context beyond what the words of the Act reasonably will bear. *See Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* — U.S. —, —, 114 S.Ct. 1439, 1446, 128 L.Ed.2d 119 (1994) ("With respect ... to ... the scope of conduct prohibited by § 10(b), the text of the statute controls our decision."); *Chiarella,* 445 U.S. at 234, 100 S.Ct. at 1118 ("As we have emphasized before, the 1934 Act cannot be read ' "more broadly than its language and the statutory scheme reasonably permit." ' " (citation omitted)). It is with this simple, but oft-forgotten, admonition in mind that we adjudge the validity of the misappropriation theory.

■ Manipulation and deception are the touchstones of section 10(b) liability: "The language of § 10(b) gives no indication that Congress meant to prohibit any conduct not involving manipulation or deception." *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 473, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977). Section 10(b) thus makes it "unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ... any *manipulative* or *deceptive* device or contrivance," in contravention of SEC rules. 15 U.S.C. § 78j(b) (emphasis added). For purposes of assessing the validity of the misappropriation theory, we need focus solely on the scope of the statutory phrase "deception" "in connection with" a securities transaction and the Rule 10b–5 phrase "fraud" "in connection with" a securities transaction, because "manipulation" is "virtually a term of art" in the securities context, *see Santa Fe Indus.,* 430 U.S. at 476, 97 S.Ct. at 1302 (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976)), referencing "practices, such as wash sales, matched orders, or rigged prices," that are "intended to mislead inves-

tors by artificially affecting market activity," *id.* Our specific concern is whether the Rule's prohibition of "fraud" "in connection with the purchase or sale of any security," which can be read no more broadly than the statutory prohibition of "deception" "in connection with the purchase or sale of any security," *see infra* note 17, may extend to breaches of fiduciary duty involving the misappropriation of confidential information from one who is neither a purchaser nor seller of securities, or otherwise connected with a securities transaction.

In *Santa Fe Industries,* the Supreme Court defined the "deception" proscribed in section 10(b) as the making of a material misrepresentation or the nondisclosure of material information in violation of a duty to disclose. In so defining the term, the Court squarely rejected the Second Circuit's interpretation of section 10(b) that "neither misrepresentation nor nondisclosure [is] a necessary element of a Rule 10b–5 action." *Santa Fe Indus.,* 430 U.S. at 470, 97 S.Ct. at 1299. Indeed, the Court in *Santa Fe Industries* specifically rejected the notion that a breach of fiduciary duty, in and of itself, is prohibited by section 10(b), reasoning that "[t]o the extent" the lower court, in imposing liability,

> rel[ied] on the use of the term "fraud" in Rule 10b–5 to bring within the ambit of the Rule all breaches of fiduciary duty in connection with a securities transaction, its interpretation would ... "add a gloss to the operative language of the statute quite different from its commonly accepted meaning."

*Id.* at 472, 97 S.Ct. at 1300 (quoting *Ernst & Ernst,* 425 U.S. at 199, 96 S.Ct. at 1383); *see also id.* at 473–74, 97 S.Ct. at 1301 ("Thus the claim of fraud and fiduciary breach in this complaint states a cause of action under any part of Rule 10b–5 only if the conduct alleged can be fairly viewed as 'manipulative or deceptive' within the meaning of the statute."). Only last Term, the Court reaffirmed that the term "deception" in section 10(b) references only the misrepresentation or omission of a material fact:

> As in earlier cases considering conduct prohibited by § 10(b), we again conclude that the statute prohibits only the making

of a material misstatement (or omission) or the commission of a manipulative act.

*Central Bank of Denver,* —— U.S. at ——, 114 S.Ct. at 1448 (citing *Santa Fe Indus.,* 430 U.S. at 473, 97 S.Ct. at 1301; *Ernst & Ernst,* 425 U.S. at 214, 96 S.Ct. at 1391). Significantly, the Court also repeated what it characterized as the "holding" of *Santa Fe Industries:* that section 10(b) does not "reach[ ] breaches of fiduciary duty ... without any charge of misrepresentation or lack of disclosure." *Id.* at ——, 114 S.Ct. at 1446 (quoting *Santa Fe Indus.,* 430 U.S. at 470, 97 S.Ct. at 1299). That these principles established in *Santa Fe Industries* and *Central Bank of Denver* are applicable in criminal and enforcement actions under section 10(b) was confirmed by the Court in *Dirks v. SEC,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983), an SEC enforcement action:

> Not "all breaches of fiduciary duty in connection with a securities transaction" ... come within the ambit of Rule 10b–5. There must also be "manipulation or deception." ... Thus, an insider will be liable under Rule 10b–5 only where he fails to disclose material nonpublic information before trading on it [in violation of a duty to disclose or abstain] and thus makes "secret profits."

*Id.* at 654, 103 S.Ct. at 3261 (quoting *Santa Fe Indus.,* 430 U.S. at 472) (other citations omitted).

At the same time that the Court has repeatedly emphasized that section 10(b) is concerned only with deception in the form of material misrepresentations and omissions, it has equally clearly instructed that the section is primarily if not exclusively concerned with the deception of purchasers and sellers of securities, but at most extends to purchasers and sellers, other investors, and persons with a similar stake in an actual or proposed securities transaction. It is only the breach of a duty to these persons that can give rise to a criminal conviction under section 10(b), if the statutory requirement that the fraud be in connection with the purchase or sale of securities is not to be rendered meaningless.

The Court has left no doubt that the principal concern of section 10(b) is the

protection of purchasers and sellers of securities. This was the very premise of the Court's leading cases in *Chiarella* and *Dirks*, and most recently, *Central Bank of Denver*. The Court observed in *Chiarella* that the duty to disclose material, non-public information or abstain from trading under section 10(b) exists only when a trader is under an affirmative duty to disclose information, *Chiarella*, 445 U.S. at 228, 100 S.Ct. at 1114–15, a duty which only "aris[es] from a relationship of trust and confidence *between parties to a transaction*," *id.* at 230, 100 S.Ct. at 1115 (emphasis added). *Dirks* "reaffirm[ed] ... that '[a] duty [to disclose] arises from the relationship between parties ... and not merely from one's ability to acquire information because of his position in the market.'" [8] *Dirks*, 463 U.S. at 657–58, 103 S.Ct. at 3263 (quoting *Chiarella*, 445 U.S. at 231–32 n. 14, 100 S.Ct. at 1116 n. 14).[9] And in holding that section 10(b) does not authorize civil liability for aiding and abetting securities fraud, the Court in *Central Bank of Denver* again artic-

ulated this limitation on the scope of section 10(b):

> Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b–5.

*Central Bank of Denver*, —— U.S. at ——, 114 S.Ct. at 1455.

We believe that *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), may also be understood as recognition that section 10(b) is primarily concerned with purchasers and sellers of securities.[10] In *Blue Chip Stamps*, the Court held that only actual purchasers and sellers of securities may bring an implied private action under Rule 10b–5. Although many, including Members of the Court, have characterized *Blue Chip Stamps* as exclusively a policy-driven opinion,[11] the Court

**8.** *Chiarella* referred to the relationship giving rise to a duty both as one "between parties to a transaction," *Chiarella*, 445 U.S. at 230, 100 S.Ct. at 1115–16, and as one, more generically, "between parties," *id.* at 231 n. 14, 100 S.Ct. at 1116 n. 14. *Dirks* refers only to the latter passage, but apparently only because of its interest in reemphasizing that mere possession of market information does not give rise to a disclosure duty, a point made only in the latter passage from *Chiarella*.

**9.** *Chiarella* and *Dirks* arose in the context of alleged nondisclosure. We presume, though the Court has not so stated, that a larger pool of investors is subject to the duty of fair representation than that subject to the duty to disclose or abstain, in that a party to a transaction who makes a representation will ordinarily be under a duty of fair representation even if he does not qualify as an insider, quasi-insider, or tippee under *Chiarella* and *Dirks*. However, we can discern no basis under the reasoning of those cases or in the statutory language for concluding that the duty of fair representation under section 10(b), like the duty to disclose or abstain, runs to anyone other than a purchaser or seller of securities, or to some other party connected with or otherwise interested in a securities transaction.

**10.** We appreciate the technical inapplicability of *Blue Chip Stamps* in the criminal context. *Cf. United States v. Naftalin*, 441 U.S. 768, 774 n. 6, 99 S.Ct. 2077, 2082 n. 6, 60 L.Ed.2d 624 (1979) (noting in context of prosecution under section 17(a) that purchaser/seller standing limitation of *Blue Chip Stamps*, applicable in implied civil

actions, is "inapplicable" in a criminal prosecution); *SEC v. National Sec., Inc.*, 393 U.S. 453, 467 n. 9, 89 S.Ct. 564, 572 n. 9, 21 L.Ed.2d 668 (1969); *see also Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 281, 112 S.Ct. 1311, 1324–25, 117 L.Ed.2d 532 (1992) (O'Connor, J., concurring in part and concurring in the judgment) ("[T]he purchaser/seller standing requirement for private civil actions under § 10(b) and Rule 10b–5 is of no import in criminal prosecutions for willful violations of those provisions."). *But see id.* at 283, 112 S.Ct. at 1325–26 (stating view, in context of analogous civil RICO provision, that "Congress' use of the word 'sale' in defining the predicate offense does not *necessarily* dictate that a RICO plaintiff have been a party to an executed sale" (emphasis in original)).

**11.** *See, e.g., Holmes*, 503 U.S. at 284, 112 S.Ct. at 1326 (O'Connor, concurring in part and concurring in the judgment) ("The purchaser/seller standing limitation in Rule 10b–5 damages actions ... does not stem from a construction of the phrase 'in connection with the purchase or sale of any security.'"); *id.* at 285, 112 S.Ct. at 1326–27 ("In *Blue Chip Stamps*, we adopted the purchaser/seller standing limitation in § 10(b) cases as a prudential means of avoiding the problems of proof when no security was traded and the nuisance potential of vexatious litigation."); *id.* at 289–90, 112 S.Ct. at 1328–29 (Scalia, J., concurring in the judgment) ("I think ... that the limitation we approved in *Blue Chip Stamps* was essentially a legislative judgment rather than an interpretive one.").

rested its decision in that case first upon the statutory language of section 10(b). As the Court explained in reaching its holding, the language of section 10(b) would "surely [be] badly strained [if] construed to provide a cause of action, not to purchasers and sellers of securities, but to the world at large." *Id* . at 733 n. 5, 95 S.Ct. at 1924 n. 5; *see also id.* at 733, 95 S.Ct. at 1924 (Section 10(b)'s "wording . . . directed toward injury suffered 'in connection with the purchase or sale' of securities . . . argues significantly in favor" of a purchaser/seller requirement). Thus, *Blue Chip Stamps* is informed in no small part by the statute's language. *See id.* at 733–37, 95 S.Ct. at 1924–26; *see also id.* at 756, 95 S.Ct. at 1935 (Powell, J., concurring) (emphasizing that the Court's opinion recites "impressive evidence in the texts of [the 1933 and 1934 Acts] demonstrat[ing] clearly that Congress selectively and carefully distinguished between offers, purchases, and sales"); *Musick, Peeler & Garrett v. Employers Ins. of Wausau,* — U.S. —, —, 113 S.Ct. 2085, 2095, 124 L.Ed.2d 194 (1993) (Thomas, J., dissenting, joined by Blackmun and O'Connor, JJ.) ("We based [our] conclusion [in *Blue Chip Stamps* ] largely on the language of § 10(b) and Rule 10b–5, which by their terms govern only 'the purchase or sale of any security.' "). Three Members of the Court even wrote separately to emphasize that the plain language of section 10(b) limited any action to purchasers or sellers of securities. *See Blue Chip Stamps,* 421 U.S at 760, 95 S.Ct. at 1937 (Powell, J., concurring). Of course, to the extent that *Blue Chip Stamps* does rest upon the language of section 10(b), it is "applicable whenever a violation of § 10(b) or Rule 10b–5 is alleged," *Aaron v. SEC,* 446 U.S. 680, 691, 100 S.Ct. 1945,.1953, 64 L.Ed.2d 611 (1980), whether in the civil or criminal context.

Where the Court has not expressly limited the scope of the statute to frauds upon purchasers or sellers, it has, for the most part, described the statute as reaching no further than to frauds upon investors. *See, e.g.,*

*Dirks,* 463 U.S. at 663 n. 23, 103 S.Ct. at 3266 n. 23 ("[A] violation [of section 10(b) ] may be found only where there is 'intentional or willful conduct designed to deceive or defraud *investors.*' " (emphasis added) (citation omitted)); *Central Bank of Denver,* — U.S. at —, 114 S.Ct. at 1446 ("[B]road congressional purpose[ ]" of Act is "to protect investors from false and misleading practices that might injure them."); *cf. Santa Fe Indus.,* 430 U.S. at 476–77 (purpose of prohibition on manipulation to protect investors from being misled).

The only other persons whom the Court has intimated may come within the purview of section 10(b) are likewise closely linked to securities transactions. For example, the Court in *Blue Chip Stamps* acknowledged that the purchaser/seller requirement that it adopted in the civil implied action context "undoubtedly excludes plaintiffs who have in fact been damaged by violations of Rule 10b–5." *Blue Chip Stamps,* 421 U.S. at 743, 95 S.Ct. at 1929. But the only parties excluded from bringing a civil action as to whom the *Blue Chip Stamps* Court expressed concern were "potential purchasers of shares" and "actual shareholders" who decide not to purchase or sell due to material misrepresentations or omissions, and "shareholders, creditors, and perhaps others related to an issuer who suffered loss in the value of their investment due to corporate or insider activities." *Id.* at 737–38, 95 S.Ct. at 1926. Similarly, in the analogous context of section 17(a) of the 1933 Act, the Court in *United States v. Naftalin,* 441 U.S. 768, 99 S.Ct. 2077, 60 L.Ed.2d 624 (1979), noted that protection of investors is not the sole purpose of the Securities Acts, *id.* at 775, 99 S.Ct. at 2082–83, and held that section 17(a) protects financial intermediaries such as stockbrokers, because their welfare is "inextricably linked" to that of investors, *id.* at 776, 99 S.Ct. at 2083; *see also id.* at 773, 99 S.Ct. at 2081–82 (describing section 17(a)(1) as reaching fraud "in any particular phase of the selling transaction").[12]

---

**12.** In identifying the set of persons protected by section 10(b) in the manner we do, we should not be understood as holding that a fraud upon any of these persons will necessarily give rise to criminal liability under section 10(b). The Supreme Court purposely has not defined the contours of the statute with precision, and we need not, and do not, attempt in this opinion what the Court has wisely avoided. We define the set of persons in the broadest terms for purposes of

In light of the Court's consistent interpretation of section 10(b) as proscribing only the deception, by material misrepresentation or omission, of a purchaser or seller of securities, or of a person in some way connected with or having a stake in an actual or proposed purchase or sale of securities, we believe that the misappropriation theory cannot be defended. Although the misappropriation of information in breach of a fiduciary duty may, in a generalized sense, involve deception,[13] in most cases such misappropriation will not constitute a "misrepresentation" or "nondisclosure." [14] In any event, by its own terms, the misappropriation theory does not even require deception, but rather allows the imposition of liability upon the mere breach of a fiduciary relationship or similar relationship of trust and confidence. Such a theory obviously cannot be squared with the holding of *Santa Fe Industries* that a breach of fiduciary duty, even in connection with a purchase or sale of securities, does not give rise to liability under section 10(b), absent deception. *See Santa Fe Indus.,* 430 U.S. at 473–74, 97 S.Ct. at 1300–01.[15]

Even if the misappropriation theory required deception, or deception were otherwise present, the theory still does not require deception violative of a duty of fair representation or disclosure owed to a market participant, *i.e.,* deception in connection with a purchase or sale of securities.[16] Section 10(b), it

this opinion merely to highlight that the misappropriation theory we reject requires essentially no connection between the fraud and a securities transaction. In other words, even under the broadest understanding of the statute's scope, the misappropriation theory that we are considering is invalid.

**13.** *See, e.g., Carpenter,* 484 U.S. at 28, 108 S.Ct. at 321–22 (playing role as loyal employee while appropriating confidential business information for one's own use is "deceit"); *Superintendent of Ins. v. Bankers Life & Casualty Co.,* 404 U.S. 6, 10–11 n. 7, 92 S.Ct. 165, 168 at n. 7, 30 L.Ed.2d 128 (1971) ("[M]isappropriation is a 'garden variety' type of fraud."); *Clark,* 915 F.2d at 448 ("[B]y becoming part of a fiduciary or similar relationship, an individual is implicitly stating that she will not divulge or use to her own advantage information entrusted to her in the utmost confidence. She deceives the other party by playing the role of the trustworthy employee or agent; she defrauds it by actually using the stolen information to its detriment.").

**14.** *See, e.g., Chestman,* 947 F.2d at 578 (Winter, J., concurring in part and dissenting in part) ("[T]heft rather than fraud or deceit, seems the gravamen of the [misappropriation] prohibition."); *Pross v. Katz,* 784 F.2d 455, 457–58 (2d Cir.1986) (citing *Santa Fe Indus.,* 430 U.S. 462) ("Making a specific promise to perform a particular act in the future while secretly intending not to perform may violate Section 10(b) ... if the promise is part of the consideration for a sale of securities.... However, generalized promises to act as a faithful fiduciary stand on a different footing than other promises of future performance [and] ... the failure to perform a promise not to breach such a duty also does not violate federal law." (citations omitted)); *Santa Fe Indus.,* 430 U.S. at 471–74, 97 S.Ct. at 1299–1301 (mere breach of fiduciary duty, even one in connection with a securities transaction, does not constitute fraud within meaning of section

10(b)); *Chiarella,* 445 U.S. at 225 n. 5, 100 S.Ct. at 1113 n. 5 (noting dismissal of Rule 10b-5(b) charge relating to nondisclosure on ground that "petitioner made no statements at all in connection with the purchase of stock").

**15.** Of course, to the extent that Rule 10b-5 may be read to prohibit conduct that is not subject to prohibition under section 10(b), the Rule is invalid. As the Supreme Court reminded specifically with respect to Rule 10b-5 in *Santa Fe Industries,* because the SEC's rulemaking power is not the power to make law, the scope of Rule 10b-5 "cannot exceed the power granted the Commission by Congress under § 10(b)." *Santa Fe Indus.,* 430 U.S. at 472–73, 97 S.Ct. at 1300 (quoting *Ernst & Ernst,* 425 U.S. at 214, 96 S.Ct. at 1391); *see also Central Bank of Denver,* — U.S. at ——, 114 S.Ct. at 1446 ("We have refused to allow 10b-5 challenges to conduct not prohibited by the text of the statute."); *Santa Fe Indus.,* 430 U.S. at 472, 97 S.Ct. at 1300 ("[I]n deciding whether [conduct constitutes] 'fraud' under Rule 10b-5, 'we turn first to the language of § 10(b).' " (citation omitted)); *id.* ("[T]he statute must control the interpretation of the Rule.").

**16.** The misappropriation theory likewise does not attempt to give meaning to the materiality requirement of section 10(b), nor could it. The only relevant misrepresentation or nondisclosure under the misappropriation theory, assuming such is present, is that to the source of the information. Because the source generally is not connected to or interested in the securities transaction, it would be meaningless to ask whether that misrepresentation affected the source's investment decision. *See Basic Inc. v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) ("[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix"

bears repeating, reaches only deception of persons with some connection to, or some interest or stake in, an actual or proposed purchase or sale of securities. The misappropriation of information from an individual who is in no way connected to, or even interested in, securities is simply not the kind of conduct with which the securities laws, as presently written, are concerned.[17] In essence, the misappropriation theory disregards the specific statutory requirement of deception, in favor of a requirement of a mere fiduciary breach, and then artificially divides into two discrete requirements—*a* fiduciary breach and *a* purchase or sale of securities—the single indivisible requirement of deception upon the purchaser or seller of securities, or upon some other person intimately linked with or affected by a securities transaction. In so doing, the theory effectively eliminates the requirement that a person in some way connected to a securities transaction be deceived, allowing conviction not only where the "defrauded" person has no connection with a securities transaction, but where no investor or market participant has been deceived. In allowing the statute's unitary requirement to be satisfied by any fiduciary breach (whether or not it entails deceit) that is followed by a securities transaction (whether or not the breach is of a duty owed to a purchaser or seller of securities, or to another market participant), the misappropriation theory transforms section 10(b) from

a rule intended to govern and protect relations among market participants who are owed duties under the securities laws into a federal common law governing and protecting any and all trust relationships. If, as the Supreme Court has held, the fraud-on-the-market theory is insupportable because section 10(b) does not ensure equal information to all investors, *Chiarella,* 445 U.S. at 233–34, 100 S.Ct. at 1117–18, *a fortiori* such a general fraud-on-the-source theory in pursuit of the same parity of information cannot be defended.

Though the text of section 10(b) as interpreted by the Supreme Court is itself a sufficient basis upon which to reject the misappropriation theory, the principles that inform interpretation of the securities fraud provisions also counsel rejection of the theory. The Supreme Court has repeatedly emphasized that the securities market "demands certainty and predictability," *Central Bank of Denver,* —— U.S. at ——, 114 S.Ct. at 1454 (citation omitted), and that "it is essential ... to have a guiding principle for those whose daily activities must be limited and instructed by the SEC's inside-trading rules," *Dirks,* 463 U.S. at 664, 103 S.Ct. at 3266; *see also id.* at 658 n. 17, 103 S.Ct. at 3263 n. 17 ("imprecise" rules "prevent[ ] parties from ordering their actions in accord with legal requirements"); *id.* (market par-

---

of information made available.'" (citation omitted)).

**17.** Those courts that have adopted the misappropriation theory have reconciled the theory with the statute's requirement that deception occur "in connection with the purchase or sale of any security" by concluding that the deception need only "touch" a securities transaction, citing *dicta* from *Superintendent of Ins. v. Bankers Life & Casualty Co.,* 404 U.S. 6, 12–13, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971) ("The crux of the present case is that Manhattan suffered an injury as a result of deceptive practices *touching* its sale of securities as an investor." (emphasis added)). *See, e.g., Newman,* 664 F.2d at 18 (Act requires merely that the fraud "touch" the securities transaction, a "very tenuous" connection); *Clark,* 915 F.2d at 449 (requiring only that "the fraud must somehow 'touch' upon securities transactions").

Not only can the isolated passage from *Bankers Life* not fairly be read to eliminate the require-

ment of fraud upon a purchaser or seller, or some other person linked to a securities transaction, it would not occur to us to so read it, given that the fraud victim in *Bankers Life* was the seller of securities, who suffered injuries "as an investor." *Bankers Life,* 404 U.S. at 10, 92 S.Ct. at 168. In fact, in *Bankers Life* the Court stated its understanding that section 10(b) only "bar[red] deceptive devices and contrivances *in the purchase or sale of securities.*" *Id.* at 12, 92 S.Ct. at 169 (emphasis added). We therefore remain as skeptical today as we were a decade ago about reading too much into the "touch" language of *Bankers Life:*

> The *Bankers Life "de minimis* touch test" might be read literally and expansively to make any securities transaction actionable under Rule 10b–5 so long as there was some deceptive practice remotely "touching" the transaction. But we think the test could not have been intended to be applied in so unlimited a way.

*Head v. Head,* 759 F.2d 1172, 1175 (4th Cir.1985) (citation omitted).

ticipants must "have some guidance as to where the line is between permissible and impermissible disclosures and uses"); *id.* at 664, 103 S.Ct. at 3266 (rejecting "rule adopted by the SEC" because it "would have no limiting principle"). Absent clearly defined rules, investors find themselves the targets of *ad hoc* decisionmaking or pawns in an overall litigation strategy known only to the SEC. *See Central Bank of Denver,* —— U.S. at ——, 114 S.Ct. at 1454 (noting "undesirab[ility] ... of decisions 'made on an ad hoc basis' " (citation omitted)); *Dirks,* 463 U.S. at 664 n. 24, 103 S.Ct. at 3266–67 n. 24 (investor reliance upon the reasonableness of SEC's litigation strategy "can be hazardous").

It would be difficult to overstate the uncertainty that has been introduced into the already uncertain law governing fraudulent securities transactions through adoption of the misappropriation theory, with its linchpin the breach of a fiduciary duty. As the Second Circuit noted in *Chestman,* "[t]he existence of fiduciary duties in ... common law settings" outside the shareholder relations context "is anything but clear." *Chestman,* 947 F.2d at 567; *see also id.* ("[F]iduciary duties are circumscribed with some clarity in the context of shareholder relations but lack definition in other contexts."). Indeed, although fifteen years have passed since the theory's inception, no court adopting the misappropriation theory has offered a principled basis for distinguishing which types of fiduciary or similar relationships of trust and confidence can give rise to Rule 10b–5 liability and which cannot. After repeatedly grappling with its own misappropriation theory, the only guidance that the Second Circuit has been able to provide, apart from its observation that the misappropriation theory rests on general notions of "dependency and influence," *id.* at 569, is that it "will not apply outer permutations of chancery relief in addressing" whether a fiduciary duty or similar relationship of trust and confidence has been breached, *id.* at 570.

Thus far, the misappropriation theory has been invoked by federal prosecutors and securities regulators to regulate such diverse relationships as that between an employer and employee, *see Newman,* 664 F.2d at 17,

between an employer and an employee's tippees, *see id.,* between a newspaper and its reporters, *see United States v. Carpenter,* 791 F.2d 1024, 1026 (2d Cir.1986), *aff'd in part and aff'd by equally divided Court in part,* 484 U.S. 19, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), between an employer and a former employee, *see Cherif,* 933 F.2d at 411, between a psychiatrist and his patient, *see United States v. Willis,* 737 F.Supp. 269 (S.D.N.Y.1990), between a husband and wife, *see Chestman,* 947 F.2d at 564, between a father and son, *see United States v. Reed,* 601 F.Supp. 685 (S.D.N.Y.), *rev'd on other grounds,* 773 F.2d 477 (2d Cir.1985), and, as in this case, between a government official and his constituency. If a categorical rule applicable to each class of relationship were possible, the scope of the theory would yet be broad. But whether a fiduciary or similar relationship of trust and confidence will be held to exist can be expected to vary from state to state, from family to family, from employer to employer, and from division to division and even from employee to employee within a single employer. Moreover, while the courts adopting the misappropriation theory incant that the breach of a fiduciary relationship is a necessary element of the offense, in principle, if not in reality, these courts would be obliged to find liability in the case of simple theft by an employee, even where no fiduciary duty has been breached, for the *raison d'etre* of the misappropriation theory in fact is concern over "the unfairness inherent in trading on [stolen] information." *Chiarella,* 445 U.S. at 241, 100 S.Ct. at 1121 (Burger, C.J., dissenting) (citation omitted); *see, e.g., Cherif,* 933 F.2d at 412 & n. 6 (reserving the issue of whether Rule 10b–5 applies "even to 'mere' thieves") (citing *Chiarella,* 445 U.S. at 246, 100 S.Ct. at 1123–24 (Blackmun, J., dissenting); *Bateman Eichler, Hill Richards, Inc. v. Berner,* 472 U.S. 299, 313 n. 22, 105 S.Ct. 2622, 2630 n. 22, 86 L.Ed.2d 215 (1985)).

The only alternative to the inevitable patchwork of criminal standards that will develop under the theory would be the effective federalization of relationships historically regulated by the states. The superimposition of a "federal fiduciary principle," *Santa Fe Indus.,* 430 U.S. at 479, 97 S.Ct. at 1304,

however, would usurp the states' common law and statutory authority over fiduciary relationships, violating the Court's injunction in *Santa Fe Industries* against use of the federal securities laws to regulate areas of conduct "traditionally relegated to state law," *id.* at 478, 97 S.Ct. at 1303 (citation omitted); *see also id.* at 479, 97 S.Ct. at 1304 ("Absent a clear indication of congressional intent, we are reluctant to federalize" significant portions of state law in the name of regulating the federal securities markets.). Though there may well be a need for uniform federal standards governing the handling of confidential, market-sensitive information within the many common-law relationships customarily regulated by state law, the Court has instructed that such standards "should not be supplied by judicial extension of § 10(b) and Rule 10b–5 to 'cover the corporate universe.'" *Id.* at 480, 97 S.Ct. at 1304.

■ We realize that the expansive definition of fraud the Supreme Court has adopted in interpreting analogous statutes accommodates a theory of fraudulent misappropriation similar to that we reject herein for purposes of section 10(b) and Rule 10b–5. *See, e.g., Carpenter,* 484 U.S. at 27, 108 S.Ct. at 321 (holding with respect to the federal mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, that "[t]he concept of 'fraud' includes the act of embezzlement, which is the ' "fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another" ' "). However, we are not especially concerned with any inconsistency in the scope of fraud prohibited by these various statutes. *Compare Clark,* 915 F.2d at 449 ("find[ing] no linguistic reason not to apply [the *Carpenter* ] conception of fraud to the securities context," and therefore "conclud[ing] that the misappropriation theory fits comfortably within the meaning of 'fraud' in § 10(b) and Rule 10b–5"). *See also Newman,* 664 F.2d at 18 ("In other areas of the law, deceitful misappropriation of confidential information by a fiduciary, whether described as theft, conversion, or breach of trust, has consistently been held to be unlawful."). In *Santa Fe Industries,* the Supreme Court could not have been clearer that resort to statutes analogous to section 10(b) in interpreting Rule 10b–5 is to be avoided, given the different language in

section 10(b) and the distinct purposes underlying the securities fraud provisions. The Court reversed the Court of Appeals, in part, for the very reason that the lower court

> construed the term "fraud" in Rule 10b–5 by adverting to the use of the term in several of this Court's decisions in contexts other than the 1934 Act and the related Securities Act of 1933.

*Santa Fe Indus.,* 430 U.S. at 471, 97 S.Ct. at 1299–1300; *see also Carpenter,* 484 U.S. at 24, 108 S.Ct. at 319–20 (unanimously affirming mail and wire fraud convictions based on same facts that evenly divided Court on defendant's securities fraud convictions). In the end, the terms "fraud" or "deception" as used in the securities context are, like the term "manipulation," virtually terms of art, the definition of which must be found in the language of section 10(b) alone.

■ Accordingly, we hold that criminal liability under section 10(b) cannot be predicated upon the mere misappropriation of information in breach of a fiduciary duty owed to one who is neither a purchaser nor seller of securities, or in any other way connected with, or financially interested in, an actual or proposed purchase or sale of securities, even when such a breach is followed by the purchase or sale of securities. Such conduct simply does not constitute fraud in connection with the purchase or sale of securities, within the meaning of section 10(b). *See, e.g., Blue Chip Stamps,* 421 U.S. at 733 n. 5, 95 S.Ct. at 1924 n. 5 ("[T]he wording of § 10(b), making fraud *in connection with the purchase or sale of a security* a violation of the Act, is surely badly strained when construed to provide a cause of action, not to purchasers and sellers of securities, but to the world at large." (emphasis in original)). Section 10(b) is not concerned with the general fairness of securities transactions themselves, so long as there is no evidence of deception in connection with a securities transaction, in the form of material misrepresentations or omissions made to persons connected with a securities transaction. *See Santa Fe Indus.,* 430 U.S. at 478, 97 S.Ct. at 1303–04. It should come as no surprise that the provision is unconcerned with the fair-

ness of conduct toward persons such as family members, employers, medical patients, or other parties to the infinite number of similar trust relationships who are not in any way connected with or even interested in a purchase or sale of securities.

### B.

We do not believe that rejection of the particular misappropriation theory that we address today will ultimately have a notable impact on federal efforts to combat fraud in the securities markets. Much of the conduct rendered criminal under the misappropriation theory is already criminalized under section 10(b) as interpreted in *Chiarella* and *Dirks,* or under the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, as interpreted by the Court in *Carpenter* and as expanded by Congress in 18 U.S.C. § 1346.

 Many of the people who would fall within the ambit of the misappropriation theory urged in this case already owe a duty to purchasers and sellers of securities to disclose or abstain from trading, duties recognized by the Supreme Court in *Chiarella* and *Dirks* as legitimate predicates for criminal liability under section 10(b). The Second Circuit has acknowledged as much. *See, e.g., Chestman,* 947 F.2d at 566 (acknowledging that conduct on which early misappropriation convictions were based would now likely be reached without misappropriation theory). After *Dirks,* corporate insiders, such as directors and managers, and so-called temporary insiders, such as underwriters, accountants, lawyers, or consultants working for a corporation, are under a duty to disclose or abstain, as are tippees of either group. *Dirks,* 463 U.S. at 655 n. 14, 659–61, 103 S.Ct. at 3262 n. 14, 3263–65. In fact, those Justices who would have reversed the misappropriation convictions in *Carpenter* might well have believed that these are the only persons whose misappropriation of information could give rise to criminal liability under section 10(b). It was this limitation on the scope of the misappropriation theory for which the defendants argued in *Carpenter. See Carpenter,* 791 F.2d at 1028–29 (noting defendants' argument that "the misappropriation theory may be applied *only* where the

information is misappropriated by corporate insiders or so-called quasi-insiders, who owe to the corporation and its shareholders a fiduciary duty of abstention or disclosure" (emphasis added) (citation omitted)).

Those who trade on purloined information but who do not come within the *Chiarella/Dirks* definition of "insider" are still almost certain to be subject to criminal liability for federal mail or wire fraud. 18 U.S.C. §§ 1341, 1343. Under *Carpenter*'s expansive notion of "fraud," the embezzlement of confidential information, coupled with the use of mail or wire to execute a securities transaction, will likely be sufficient to establish criminal liability under sections 1341 and 1343. *Carpenter* itself, in which the Court unanimously affirmed the defendant's wire fraud convictions but divided evenly over the securities fraud conviction, is illustrative.

Congress' recent adoption of 18 U.S.C. § 1346, which prohibits "a scheme or artifice to deprive another of the intangible right of honest services," further ensures that many of the fiduciary breaches giving rise to criminal liability under the misappropriation theory may also serve as the predicate fraud under the mail and wire fraud statutes, leaving only the use of wire or the mails to complete the crime. Finally, we are also confident that the fiduciary breaches proscribed by the misappropriation theory will in many instances give rise to criminal and civil liability under the array of state laws addressing fraud and unethical conduct.

### C.

We regard the somewhat harrowing evolution of the misappropriation theory as almost a testament to the theory's invalidity. When the Second Circuit first adopted the theory fourteen years ago in affirming a criminal conviction for securities fraud, that court was unattuned to the differences in language employed in section 10(b) and Rule 10b–5 and was seemingly unaware of the existence of the Supreme Court's decision in *Santa Fe Industries.* When confronted with the theory a second time, the Second Circuit rejected the theory's application in the civil context, though employing reasoning that undermines

the theory altogether. The Circuit then resurrected the theory in the criminal context one year later, but only by unconvincingly distinguishing its decision undermining the theory. Now, although other courts have followed suit without serious analysis, the Second Circuit has begun finally to acknowledge, and express its resignation, that the theory is in substantial tension with Supreme Court precedent and is virtually incapable of principled limitation.

The Second Circuit first adopted the misappropriation theory in *United States v. Newman*, 664 F.2d 12 (2d Cir.1981), *aff'd after remand*, 722 F.2d 729 (2d Cir.), *cert. denied*, 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983). In adopting the theory, the *Newman* court cited, but did not quote or discuss, section 10(b) of the 1934 Act, and did not even cite the Supreme Court's decision in *Santa Fe Industries*. And, contrary to the Court's instructions in *Santa Fe Industries*, the *Newman* court proceeded to consider only whether the potentially broader language of Rule 10b–5 could accommodate the misappropriation theory, instead of addressing in the first instance the statutory language of section 10(b).

Freed from the constraints of the Court's interpretation of the statutory term "deception," *Newman* concluded easily that the misappropriation of information constitutes "fraud" under Rule 10b–5. *See id.* at 17 ("[W]e need spend little time on the issue of fraud and deceit."). Because the defendants " 'misappropriated—stole to put it bluntly—valuable nonpublic information entrusted to [them] in the utmost confidence,' " *id.* (quoting *Chiarella*, 445 U.S. at 245, 100 S.Ct. at 1123 (Burger, C.J., dissenting)), they had, the court concluded, "defrauded those employers as surely as if they took their money," *id.*[18] Because the court held that Rule 10b–5's predicate fraud requirement was established through the mere theft of the confidential information, it undertook no inquiry into whether there was the statutorily required deception.[19]

The *Newman* court also eliminated any requirement of a fraud upon a party connected with the securities transaction. *See id.* at 16 ("We hold that appellee's conduct ... could be found to constitute a criminal violation of section 10(b) and Rule 10b–5 despite the fact that [none of the defrauded parties] was at the time a purchaser or seller of the target company securities in any transaction with any of the defendants." (footnote omitted)).[20] Without considering the Supreme

18. The *Newman* court relied on Chief Justice Burger's dissenting opinion in *Chiarella*, which is often cited as the genesis for the misappropriation theory, for the proposition that the requisite fraud under Rule 10b–5 is established when an employee defrauds his employer by stealing confidential information. *See Newman*, 664 F.2d at 17. It is true that the Chief Justice did conclude in *Chiarella* that the language of Rule 10b–5, with its "provisions reach[ing] *any* person engaged in *any* fraudulent scheme," *Chiarella*, 445 U.S. at 240, 100 S.Ct. at 1121 (Burger, C.J., dissenting) (emphasis in original), was sufficiently broad to criminalize trading on the basis of misappropriated information. However, he specifically identified the predicate fraud, consistent with the Court's prior cases, as nondisclosure, and not the misappropriation of the information itself. *See id.* at 243 n. 4, 100 S.Ct. at 1122 n. 4 (noting his understanding that Court had not rejected his view that "an *absolute duty to disclose or refrain* arises from the very act of misappropriating nonpublic information" (emphasis added)). For the Chief Justice, therefore, the misappropriation of information gives rise to a duty, the breach of which, through trading without disclosure, constitutes fraud under the Rule.

19. In truth, it is difficult to determine from the opinion in *Newman* the precise basis upon which Newman's conviction was affirmed. Newman did not himself misappropriate any information from Morgan Stanley or Kuhn Loeb. Rather, it was Newman's co-conspirators, E. Jacque Courtois and Adrian Antoniu, employees of these two companies, who misappropriated the information. *See Newman*, 664 F.2d at 15. It appears that Newman's conviction was affirmed on the ground that he aided and abetted Courtois and Antoniu in their misappropriation of information. *Id.* at 16. At most, it seems that Newman was a *tippee, whose criminal exposure prior to Dirks* was anything but clear. *See Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 15 (2d Cir.1983) (referring to Newman as a tippee), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984).

20. The district court in *Newman* had specifically charged the jury that "the law is clear that Mr. Newman had no obligation or duty to the people from whom he bought the stock to disclose what he had learned, and, thus, he could not have defrauded these people as a matter of law." *Moss*, 719 F.2d at 13 (quoting jury charge from Newman's criminal trial).

Court's limiting interpretations of Rule 10b–5, *Newman* read the plain language of Rule 10b–5 to "contain[ ] no specific requirement that fraud be perpetrated upon the seller or buyer of securities," *id.* at 17, and found the Rule's "in connection with" requirement, "a very tenuous" requirement, to be satisfied because Newman's alleged fraud "touched" the securities transaction, *id.* at 18; *see also supra* note 17. *Newman* properly dismissed the only limitation on Rule 10b–5's scope that it perceived, the purchaser/seller requirement of *Blue Chip Stamps,* as relevant only to the issue of standing in the context of implied private rights of action. *Newman,* 664 F.2d at 17 ("The courts [through *Blue Chip Stamps* ], not the Congress, have limited Rule 10b–5 suits for damages to the purchasers and sellers of securities.").[21] Howeverer, the court never paused to consider *any* limitation on the scope of Rule 10b–5, simply presuming that the Rule applies to fraud in any fiduciary relationship.[22]

In the very next misappropriation case it decided after *Newman,* the Second Circuit, perhaps unwittingly, perhaps not, undermined the entire rationale behind the misappropriation theory. *See Moss v. Morgan Stanley Inc.,* 719 F.2d 5 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). Although the civil suit in *Moss* involved the same defendants and arose out of the same conduct that gave rise to the criminal convictions in *Newman,* the court held on the merits that the defendants had not violated Rule 10b–5. Rather than expressly repudiate *Newman,* the *Moss* court recast *Newman* as a case involving an employee's breach of his duty to his employer to "disclose or abstain" from trading, *id.* at 13, even though *Newman* was explicit that the fraud was the *theft* of information, and not the failure to disclose before trading, *see Cherif,* 933 F.2d at 409 ("The Court [in *Newman* ] was not concerned about any fraud perpetrated on the companies whose shares were traded or on the shareholders of those companies, as in *Dirks* or *Chiarella.* Instead it was influenced by the damage inflicted on the insider trader's employer by a conniving employee."). So thorough was the recharacterization, that *Moss* fails even to associate *Newman* with the misappropriation theory, much less to credit that case with having first adopted it; indeed, no citation to *Newman* appears in *Moss*' subsequent analysis of a version of the misappropriation theory. *Moss,* 719 F.2d at 15–16. *Moss* finally disposed of *Newman* by distinguishing it on the ground that the purported duty to abstain or disclose running to an employer is not a duty that runs to the market as a whole. *See id.* at 13 ("Nothing in ... *Newman* suggests" that the asserted duty of disclosure between an em-

**21.** In rejecting a purchaser or seller requirement, the Second Circuit relied on its injunctive relief cases, which had read Rule 10b–5 not to embody a purchaser/seller requirement, and noted that Newman "reasonably should have anticipated that in a criminal action the courts likewise would follow the language of the Rule." *Newman,* 664 F.2d at 17. These cases, decided before *Blue Chip Stamps,* have since been questioned. The District of Columbia Circuit squarely rejected the exception to the purchaser/seller requirement for plaintiffs seeking injunctive relief as irreconcilable with *Blue Chip Stamps. Cowin v. Bresler,* 741 F.2d 410, 424 (D.C.Cir. 1984) (Bork, J.) ("The relaxed standing requirement urged on us by appellant would be contrary to the rationale of section 10(b) and Rule 10b–5 as perceived by the Supreme Court in *Blue Chip.*"). This circuit recently reserved the question but suggested that any exception would be a "very limited" one that "applies in narrow circumstances." *Advanced Resources Int'l, Inc. v. Tri–Star Petroleum Co.,* 4 F.3d 327, 332 (4th Cir.1993).

**22.** Ironically, it appears that *Newman*'s startling expansion of Rule 10b–5 liability, with its elimination of the statute's requirement of deception of a party connected with the securities transaction, was unnecessary to affirm the convictions in that case. The government in *Newman,* perhaps sensing the strain that would be imposed on section 10(b)'s language by the misappropriation theory, urged the Second Circuit to construe the indictment to allege securities violations "on the theory that the defendants, by purchasing stock in [clients of the investment banking firms they worked for], defrauded the shareholders" of the client companies—conduct recognized as potentially violative of section 10(b) in *Chiarella. Newman,* 664 F.2d at 15 n. 1. The *Newman* court declined the government's invitation. *Id.*

In a similar vein, although not on substantively identical grounds, the government had earlier attempted to narrow the basis upon which it sought to support the defendant's conviction before the Supreme Court in *Chiarella. See Chiarella,* 445 U.S. at 235–26, 100 S.Ct. at 1118; *see also Chestman,* 947 F.2d at 575 (Winter, J., concurring in part and dissenting in part).

ployee and employer "should be stretched to encompass an employee's 'duty of disclosure' to the general public".).[23]

The *Moss* court read section 10(b) and Rule 10b–5, as do we, to regulate relationships and duties among securities market participants and others involved in securities transactions. *Moss* fully embraced the Supreme Court's holdings in *Chiarella* and *Dirks* that "liability for nondisclosure of material nonpublic market information under section 10(b) is 'premised upon a duty to disclose arising from a relationship of trust and confidence between parties to a transaction,'" *id.* at 12, and concluded that "[a]bsent an 'insider' or 'fiduciary' relationship with the sellers of stock, a purchaser has no duty to disclose nonpublic market information," *id.* In light of these authorities and *Santa Fe Industries, Moss* held that Rule 10b–5 liability could not be predicated on the defendants' misappropriation of confidential information. Although the plaintiff in *Moss* proceeded under a version of the misappropriation theory more akin to that articulated in Chief Justice Burger's *Chiarella* dissent than that developed in *Newman, see id.* at 15–16, the reasoning employed in *Moss* to foreclose liabili-

ty—that the defendants "committed no 'fraud' in purchasing shares of Deseret stock," because they "owed no duty of disclosure to plaintiff Moss," *id.* at 16—applies equally to the misappropriation theory articulated in *Newman. Moss'* observations are true under either version of the misappropriation theory:

> In effect, plaintiff's "misappropriation" theory would grant him a windfall recovery simply to discourage tortious conduct by securities purchasers. Yet, the Supreme Court has made clear that section 10(b) and rule 10b–5 protect investors against *fraud;* they do not remedy every instance of undesirable conduct involving securities.

*Id.* (emphasis in original) (citing *Chiarella,* 445 U.S. at 232, 100 S.Ct. at 1116–17; *Santa Fe Indus.,* 430 U.S. at 474–77, 97 S.Ct. at 1301–03).

Notwithstanding that the reasoning in *Moss* virtually compelled across-the-board rejection of the misappropriation theory articulated in *Newman,* the Second Circuit just one year after *Moss* reaffirmed the validity of criminal liability based upon *Newman's* misappropriation theory. *See SEC v. Materia,* 745 F.2d 197, 201 (2d Cir.1984) (endeav-

---

**23.** It is virtually impossible to discern the logic behind the *Moss* court's distinction of *Newman.* This is due to what appears to be a double-misreading of footnote one from the *Newman* opinion.

The plaintiff in *Moss* was a shareholder in a company called Deseret. Deseret was the target company in a friendly takeover by Warner–Lambert, a client of the investment banking firm of Morgan Stanley. Courtois worked for Morgan Stanley and provided Newman with information regarding the Deseret takeover. Moss relied on *Newman* for the proposition that because Courtois (and through his association with Courtois, Newman) owed a duty to Morgan Stanley, and to Morgan Stanley's client, Warner–Lambert, Newman also owed a separate duty of disclosure to Warner–Lambert's target, Deseret. *Moss,* 719 F.2d at 13.

According to *Moss,* footnote one of the *Newman* opinion "explicitly limited" *Newman's* holding in a way that foreclosed Moss' proposed linking of liability. *Id.* (citing *Newman,* 664 F.2d at 15 n. 1); *see also supra* note 22. This reading of the *Newman* footnote is flawed in two ways. First, the footnote in no way purported to "limit" the holding of that case. It was merely a notation by the court that the government, at the last minute, attempted to reconstrue the indictment such that Newman's criminal liability would

have been predicated on a breach of duty to Morgan Stanley's and Kuhn Loeb's *clients,* instead of to Morgan Stanley and Kuhn Loeb themselves, thereby bringing Newman's charged conduct closer in line with the Court's then-new opinion in *Chiarella:*

> In two instances the targets themselves were *clients* of the investment banking firms. The Government belatedly suggests that the indictment should be construed to allege securities laws violations in these two instances, on the theory that the defendants, by purchasing stock in the target companies [*i.e.,* in the investment banking firms' *clients* ], *defrauded the shareholders of those companies.*

*Moss,* 719 F.2d at 13 (quoting *Newman,* 664 F.2d at 15 n. 1) (first emphasis added; second emphasis added by *Moss* court). Second, the *Newman* footnote does not even address whether or how Courtois and Newman could have owed a duty to Deseret, which, though a "target" company, was not a "client" of Morgan Stanley. It appears that *Moss* focused on the identification of "targets" in the second sentence and assumed the footnote was discussing parties like Deseret, which was a target, but missed the fact that the "targets" the government identified in *Newman* footnote one were, unlike Deseret, "clients" of Morgan Stanley, and therefore, at least plausibly, *were* owed a duty under *Chiarella* and *Dirks.*

oring to "delineate the contours of what may still be perceived as a novel theory of liability under the antifraud provisions"), *cert. denied,* 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985). In order to save the misappropriation theory from the reasoning of *Moss, Materia* held that the requirement of a duty running between parties to a transaction, established in *Chiarella* and applied in *Moss,* is a duty that applies only in the context of implied civil actions:

> Only by fashioning the private right with which we are by now so familiar, were courts forced to deal with ancillary issues such as standing, *see Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), and whether a defendant has breached a duty to a particular plaintiff, *see Moss v. Morgan Stanley, Inc.,* [719 F.2d 5 (2d Cir.1983)]. Indeed, these issues are germane only in the context of private civil litigation. In reviewing an enforcement action such as this, our concern "must be with the scope of the Rule," *Newman,* [664 F.2d at 17], rather than the precise direction in which a duty may have been owed. For this reason, Materia's attempted reliance on *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), is misplaced....

> *Moss v. Morgan Stanley Co.,* ... relied on by Materia, does not [contradict the misappropriation theory]. That case, arising out of the same facts as *Newman,* was a private action brought by shareholders who unwittingly sold stock to Newman and his cohorts. This court affirmed the dismissal of the action on the same limited grounds announced by the Supreme Court in *Chiarella.* The defendants owed no duty to the plaintiffs. At the risk of repetition, we stress that such analysis bears only on the type of question raised in a private suit for damages; it is not relevant to an inquiry into whether the Rule was or was not contravened.

*Materia,* 745 F.2d at 202–03. Thus, *Materia* relegated *Chiarella,* a criminal case concerned solely with the scope of liability under Rule 10b–5, *see Central Bank of Denver,* —— U.S. at ——, 114 S.Ct. at 1445 (*Chiarella* concerned with "scope of conduct prohibited by § 10(b)"), to a case bearing only on private civil actions. In the same way, *Materia* misread *Moss. Moss'* rejection of the misappropriation theory was based entirely on the scope of Rule 10b–5, as was the decision in *Chiarella,* and not on the distinction between criminal and civil actions. Nor was there any issue of standing in *Moss,* as the plaintiff in *Moss* was an actual seller of securities. It is apparent, in sum, that the *Materia* court failed to recognize any difference between the standing limitation of *Blue Chip Stamps* and the substantive limitation on the scope of Rule 10b–5 imposed by *Chiarella* and recognized in *Moss,* in what was either a necessary move to save the theory after *Moss* or, more likely, an unwitting error. *Compare Clark,* 915 F.2d at 445 (characterizing *Materia* as concluding that duty to disclose is relevant to determine whether plaintiff has standing).

Despite the Second Circuit's seeming inability to steady the misappropriation theory on a firm doctrinal foundation, two more circuits adopted the misappropriation theory after *Materia.* The Ninth Circuit in *Clark,* although adopting the narrowest possible model of the theory, limited to the facts of that case, *see Clark,* 915 F.2d at 453, "conclude[d] that the misappropriation theory fits comfortably within the meaning of 'fraud' in § 10(b) and Rule 10b–5," *id.* at 449. The Seventh Circuit adopted the theory wholesale in *Cherif,* declining to subject the theory to rigorous review on the ground that "[t]he more precise issues of statutory construction and legislative history have been treated exhaustively elsewhere." *Cherif,* 933 F.2d at 410 n. 5. Like *Newman* and *Materia,* neither *Clark* nor *Cherif* cites, let alone discusses, the Court's decision in *Santa Fe Industries.*[24]

---

**24.** The Second Circuit regularly applies the limitation of *Santa Fe Industries* in civil actions under Rule 10b–5, though it has refused to recognize the implications of *Santa Fe* for criminal prosecutions under the misappropriation theory. *See, e.g., Field v. Trump,* 850 F.2d 938, 946–47 (2d Cir.1988) ("The Court held [in *Santa Fe Industries* ] that Section 10(b), *as its plain language suggests,* prohibits only conduct 'involving manipulation or deception,' ... deception being 'misrepresentation or nondisclosure' intended to deceive." (emphasis added) (citations omitted)),

Despite the momentum building behind the theory with its rehabilitation in *Materia,* and its adoption in *Clark* and *Cherif,* the pendulum in the Second Circuit swung decidedly against the misappropriation theory in that court's recent *en banc* decision in *United States v. Chestman,* 947 F.2d 551 (2d Cir.1991) (*en banc*), *cert. denied,* 503 U.S. 1004, 112 S.Ct. 1759, 118 L.Ed.2d 422 (1992). For the first time since *Moss,* the Second Circuit attempted in *Chestman* to square the misappropriation theory with the Supreme Court's holdings in *Santa Fe Industries, Chiarella,* and *Dirks,* and not surprisingly, realized that the misappropriation theory was neither necessary, defensible under precedent, susceptible in principle to limitation, nor justifiable on the strength of the broad purposes of the Act.

*Chestman* expressly recognized that the framework for securities fraud established by the Supreme Court over the past twenty-five years does not permit of the misappropriation theory as developed in the Second Circuit. Without even attempting to come to grips with *Materia's* statement that duties are irrelevant to criminal liability for securities fraud, the circuit belatedly acknowledged that to establish criminal liability under the Supreme Court's cases, "the predicate act of fraud must be traceable to a breach of duty to the purchasers or sellers of securities." *Id.* at 565. Realizing that it would have to go outside the Supreme Court's carefully crafted framework for establishing securities fraud liability in order to sustain the misappropriation theory, *Chestman* characterized the Court's framework as merely one "theory" of criminal liability under the statute, *see id.* at 564 (*Chiarella* and *Dirks* establish the "traditional theory of insider trader liability"), and reaffirmed the misappropriation theory as a "second general theory of Rule 10b–5 liability," *id.* at 566.

Ironically, we could scarcely describe better the tenuousness of the misappropriation theory under *Santa Fe Industries, Chiarella,* and *Dirks,* than did the Second Circuit itself in *Chestman:*

One point at which the misappropriation theory and the traditional theory of insider trading merge warrants brief consideration. Our first applications of the misappropriation theory, in *Newman* and *Materia,* concerned conduct that occurred before the Supreme Court's holding in *Dirks. Dirks* noted that an outsider could obtain temporary insider status by gaining access to confidential information through certain relationships with a corporation—as, for example, an underwriter, lawyer or consultant. 463 U.S. at 655 n. 14, 103 S.Ct. at 3262 n. 14. A temporary insider theory of prosecution might well have covered the activities of the investment banker in *Newman* and the printer in *Materia.* In *Newman* and *Materia,* the defendants appeared to have "entered into a special confidential relationship in the conduct of the business of the enterprise and [were] given access to information solely for corporate purposes." *Dirks,* 463 U.S. at 655 n. 14, 103 S.Ct. at 3262 n. 14. In view of the overlap between *Newman* and *Materia* on the one hand and the *Dirks* concept of temporary insiders on the other, we arguably did not break ranks with the traditional theory of insider trading until our holding in *Carpenter* . In *Carpenter* none of the prongs of liability under the traditional theory applied. That is, the defendants did not owe the people with whom they traded a duty to disclose or abstain from trading—absent resurrection of the twice-rejected parity of information theory. *Carpenter,* then, represents the first fact pattern we have considered that is clearly beyond the pale of the traditional theory of insider trading.

*cert. denied,* 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989); *Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 115 (2d Cir.1982) (citing *Santa Fe Indus.,* 430 U.S. at 473, 97 S.Ct. at 1300–01) ("It is well established by now that section 10(b) was not designed to regulate corporate mismanagement nor to prohibit conduct which does not involve manipulation or deception."); *Luce v. Edel-*

*stein,* 802 F.2d 49, 55 (2d Cir.1986) (citing *Ernst & Ernst,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668; *Santa Fe Indus.,* 430 U.S. at 479, 97 S.Ct. at 1304) ("To state a claim under Section 10(b), a complaint must allege material misstatements or omissions indicating an intent to deceive or defraud in connection with the purchase or sale of a security.").

After *Carpenter*, the fiduciary relationship question takes on special importance. This is because a fraud-on-the-source theory of liability extends the focus of Rule 10b–5 beyond the confined sphere of fiduciary/shareholder relations to fiduciary breaches of any sort, a particularly broad expansion of 10b–5 liability if the add-on, a "similar relationship of trust and confidence," is construed liberally. One concern triggered by this broadened inquiry is that fiduciary duties are circumscribed with some clarity in the context of shareholder relations but lack definition in other contexts. *See generally Reed*, 601 F.Supp. 685 (and authorities cited therein). Tethered to the field of shareholder relations, fiduciary obligations arise within a narrow, principled sphere. The existence of fiduciary duties in other common law settings, however, is anything but clear. Our Rule 10b–5 precedents under the misappropriation theory, moreover, provide little guidance with respect to the question of fiduciary breach, because they involved egregious fiduciary breaches arising solely in the context of employer/employee associations. *See Carpenter*, 791 F.2d at 1028 ("It is clear that defendant Winans ... breached a duty of confidentiality to his employer"); *Newman*, 664 F.2d at 17 ("we need spend little time on the issue of fraud and deceit"); *Materia*, 745 F.2d at 201 (same). For these reasons we tread cautiously in extending the misappropriation theory to new relationships, lest our efforts to construe Rule 10b–5 lose method and predictability, taking over "the whole corporate universe." *United States v. Chiarella*, 588 F.2d 1358, 1377 (2d Cir.1978) (Meskill, J., dissenting) (quoting *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 480, 97 S.Ct. 1292, 1304, 51 L.Ed.2d 480 (1977)), *rev'd*, 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980).

*Chestman*, 947 F.2d at 566–67. Even the *Chestman* dissenters, in promoting expansion of the misappropriation theory, were unable to identify a credible legal basis for the theory. Judge Winter, although he would have sustained the theory on the basis of the "policy rationale for prohibiting insider trading" advanced in an article by Frank Easterbrook, candidly admitted that "any obvious relationship [between the misappropriation theory and] Section 10(b) is presently missing." *Id.* at 578 (Winter, J., concurring in part and dissenting in part).[25]

Thus is the manner in which the misappropriation theory has evolved (or devolved) and been justified.

### D.

 Our rejection of the misappropriation theory certainly should not be taken as approval of the kind of conduct of which Bryan was convicted, nor should it be perceived as evidencing a view that such conduct is not properly the subject of criminal liability. Indeed, we understand the temptation to give "legal effect to the commonsensical view that trading on the basis of improperly obtained information is fundamentally unfair," *Carpenter*, 791 F.2d at 1029 (quoting *SEC v. Musella*, 578 F.Supp. 425, 438 (S.D.N.Y. 1984)), by abandoning "distinctions premised on the source of the information [in favor of] the prophylactic intent of the securities laws," *id.* But in securities law, as in all areas of the law, our perceptions of what is wise or fair are ultimately of no relevance. In the end, we, as judges, no less than anyone else, are bound by the actual prohibitions enacted by Congress. It is adherence to this fundamental limitation on our own authority that leads us to conclude that, as ignoble as Bryan's conduct was, it simply was not conduct that is prohibited by section 10(b) of the Securities Exchange Act of 1934. Section 10(b) is a "catch-all" provision. But, as we believe Justice Powell would have said in *Chiarella* had he had the occasion, it only catches fraud *in connection with the purchase or sale of securities*. *See Chiarella*, 445 U.S. at 234–35, 100 S.Ct. at 1117–18.

---

**25.** According to Judge Winter, "a court of appeals has no option but to continue the route" of applying the misappropriation theory, on the grounds that "the law is far enough down this road" and that the Insider Trading Sanctions Act of 1984, at least according to that Act's legislative history, "seems [to be] premised" on the misappropriation theory's applicability. *Chestman*, 947 F.2d at 578.

## V.

Bryan finally challenges his conviction for perjury under oath before a grand jury. *See* 18 U.S.C. § 1623. This conviction relates to Bryan's responses to prosecution questions before a federal grand jury regarding the drafting of the RFP for the video lottery contract. The government contended at trial that Bryan deliberately lied in response to government questioning to cover up the fact that VLC representatives had participated in the drafting of the RFP.

The grand jury questioning on which the perjury conviction is based proceeded as follows:

Q. [W]ho wrote the RFP?

A. The RFP was put together by a committee of specialized people at the Lottery. . . .

Q. I want you to tell me everybody on the committee who had any input into the document. . . .

[Omitted here are several questions and answers pertaining to Bryan's identification of the committee members who worked on the RFP.]

Q. Who else participated in the RFP?

A. Tammy Gunnoe is a specialist in the division of marketing. All of those components are required in this proposal and they all worked on this document.

Q. Who else worked on the RFP?

A. I obviously had some input on it. . . . I made recommendations that I would like to see and they worked from that. . . .

Q. Anyone else have input into the drafting of the RFP, as far as you know?

A. Well, they may have called upon people within their sections to provide information.

Q. As far as you know, did anyone else have input into it?

A. No, they were the people that I assigned to prepare it.

Q. Okay, and so we would have to ask them if they received input from others, right?

A. Yes, Ma'am.

Appellee's Br. at 34–35. Bryan contends that the questioner's initial focus on "everybody on the committee who had input into the document" led him to believe that the entire line of questioning was concerned only with which employees at the Lottery worked on the RFP. Appellant's Br. at 45.

The federal statute proscribing perjury before a grand jury provides that

> Whoever under oath . . . in any proceeding before or ancillary to any court or grand jury of the United States knowingly makes any false material declaration . . . shall be fined . . . or imprisoned.

18 U.S.C. § 1623. In interpreting the analogous federal perjury statute, 18 U.S.C. § 1621, the Supreme Court has stated that

> the perjury statute is not to be loosely construed, nor the statute invoked simply because a wily witness succeeds in derailing the questioner—so long as the witness speaks the literal truth. The burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry.

*Bronston v. United States*, 409 U.S. 352, 360, 93 S.Ct. 595, 601, 34 L.Ed.2d 568 (1973). The Court also stated that "[p]recise questioning is imperative as a predicate for the offense of perjury." *Id.* at 362, 93 S.Ct. at 602.

█ Given the Supreme Court's command to construe the perjury statute narrowly, we are sympathetic to Bryan's claim. The questioner's initial focus on committee members could well have led Bryan to believe that the question, "Did anyone else have input into it," only pertained to committee members. Bryan's response of "No, they were the people that I assigned to prepare it" evinces such an understanding. Nonetheless, we are satisfied that the prosecution's repeated inquiry into whether "*anyone* else" contributed to the RFP provided the jury an adequate basis upon which to conclude that Bryan understood that the focus of the questioning had changed from the committee members to anyone else who might have had input into the RFP and that he deliberately lied to the grand jury when he answered that no one else had been involved.

## CONCLUSION

Bryan's convictions for mail fraud, wire fraud, and perjury are hereby affirmed, his securities fraud conviction is reversed, and the sentence imposed by the district court is vacated for such reconsideration as the district court deems appropriate.

*AFFIRMED IN PART, REVERSED IN PART.*